UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK BENNETT,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>NAVY FEDERAL CREDIT UNION, EQUIFAX INFORMATION SERVICES and TRANSUNION, LLC,<br><br>　　　　　　　　Defendants. | Case No.:  3:24-CV-295 W (WVG)<br><br>**ORDER GRANTING DEFENDANT'S SUMMARY-JUDGMENT MOTION [DOC. 44]** |

Pending before the Court is Defendant Navy Federal Credit Union's summary-judgment motion. Plaintiff Frank Bennett opposes. The Court decides the matter on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). For the following reasons, the Court **GRANTS** the motion [Doc. 44].

I.　**F**ACTUAL **B**ACKGROUND

This lawsuit arises out of two loans Plaintiff Frank Bennett obtained from Defendant Navy Federal Credit Union ("NFCU") in July 2019. (*Bennett Decl.* [Doc. 46-

1

1] at ¶¶ 6, 8, 9.) The first was a personal loan for $9,500 with an interest rate of 17.75%. (*Jt. State.* [Doc. 50] at No. 8; *see also Bennett Decl.* at ¶ 8.) The loan was to be paid back over a term of 60 months with monthly payments of $240.51. (*Jt. State.* at No. 8, 9.) The second loan was for an automobile and was for $25,063.48 with an interest rate of 9.48%. (*Jt. State.* at No. 27; *see also Bennett Decl.* at ¶ 9.) The auto loan was to be paid back over a term of 72 months with monthly payments of $466.05. (*Jt. State.* at No. 27.)

### A. Bennett defaults on both loans.

Bennett defaulted on both loans after failing to make the required monthly payments. (*Jt. State.* at No. 7.) On the personal loan, Bennett made the first two payments then failed to make payments for the next three months. (*Id.* at Nos. 11, 12.) Beginning in December 2019, the status on Bennett's credit reporting account was changed to code "71," indicating the loan was 30 to 59 days past due. (*Id.* at Nos. 13, 14.)

In January 2020, Bennett made a double payment on the personal loan. (*Jt. State.* at No. 15.) Because he had missed three payments, the loan continued to be reported as past due. (*Id.*) Bennet then made a full payment in February 2020, a partial payment in March, a full payment in April and another partial payment in May. (*Id.* at Nos. 16, 17.) Based on this payment history, by approximately May 2020, NFCU was reporting the loan was 60 days past due to the Credit Reporting Agencies ("CRAs"). (*Id.* at No. 18; *Paulson Decl.* [Doc. 44-2] ¶¶ 24, 25.)

Bennett missed his June and July 2020 payments and NFCU reported the personal loan as 90 days and 120 days past due, respectively. (*Jt. State.* at No 19.) In August 2020, Bennett made a large payment that brought the loan to 90 days past due, which is how the loan was reported to the CRAs. (*Id.* at No. 20.) In November 2020, NFCU "charged off" the loan, which was now 120 days past due.[1] (*Id.* at Nos. 20, 21.)

---

[1] A loan is "charged off" when NFCU determines it is unlikely to be collected. (*Paulson Decl.* ¶ 6.)

After the personal loan was charged-off, Bennett and NFCU entered a repayment plan in December 2020. (*Jt. State.* at No. 22.) On January 26, 2023, NFCU sent Bennett a letter confirming the repayment plan for the remaining balance of $6,024.21. (*Paulson Decl.* at ¶ 31, Ex. B.) The letter provided:

> Navy Federal Credit Union agrees to an installment plan consisting of 40 monthly payments of $150.00 each, with the final payment to be received no later than 05/01/2024. *The outstanding default will continue to be reported to the credit bureaus until the agreement is complete and satisfied, at which time we will update the credit bureaus with the new information.*
>
> You must ensure we receive all required payments, and in the manner outline above. Once we receive all the required payments and the funds clear, we will consider the agreement complete. Upon completion, Navy Federal will send you a letter confirming resolution of the account for your records, an update will be sent to the major credit bureaus that the account has been paid in full, and no further collection activities will occur. If we do not receive all the payments as agreed upon, we will not consider the repayment agreement complete and collection activities on your account will continue.

(*Paulson Decl.* at Ex. B, emphasis added.)

As for the auto loan, Bennett immediately defaulted by failing to make his first payment and then made partial payments for the next four months. (*Jt. State.* at Nos. 28, 29.) Because the payments were insufficient to bring the loan current, the account status was changed to code "71" in December 2019, indicating it was 30 to 59 days past due. (*Id.* at No. 30.) Bennett then made payments in December 2019 for $646.30, in February 2020 for $699 and in March 2020 for $233. (*Id.* at Nos. 31–33.) The payments were insufficient to bring the loan current so NFCU continued to report the loan as 30-days past due. (*Id.* at No. 34.) Bennet then made full payments of $466.05 in April 2020 and May 2020, a partial payment of $433 in July 2020, and another payment in April 2021. (*Id.* at Nos. 35–38.) From July through October 2021, NFCU accurately reported the loan as 60, 90, 120 and 150 days late, respectively. (*Id.* at No. 39.) In November 2021, NFCU charged off the loan. (*Id.* at No. 40.)

3

After the auto loan was charged-off, Bennett and NFCU entered a repayment plan for the auto loan, which required him to make monthly payments of $350 until the loan was paid off. (*Jt. State.* at No. 42.) Like Bennett's repayment plan for the personal loan, on March 16, 2024, NFCU sent Bennett a letter confirming that "[t]he outstanding default will continue to be reported to the credit bureaus until the agreement is satisfied, at which time we will update the credit bureaus with the new information." (*Paulson Decl.* at ¶ 47, Ex. K.) The letter also warned: "Please note collection activities will continue if you fail to maintain an arrangement to resolve the account." (*Id.*)

### B. Bennett disputes NFCU's reporting on his credit report.

After the repayment plans were entered, NFCU continued to report that the personal and auto loans were charged off. (*Bennett Decl.* ¶¶ 20, 21.) Beginning on approximately January 4, 2023, Bennett submitted disputes to the CRAs related to NFCU's reporting on his loans. (*Id.* ¶ 22.)

If a consumer disagrees with the credit reporting on a loan or credit card account, the consumer can submit a dispute to a CRA. (*Jt. State.* at No. 53.) The CRA can then report the dispute to the credit furnisher —i.e. NFCU— through an Automated Credit Dispute Verification. (*Id.* at No. 54.) The credit furnisher then investigates the dispute and, if necessary, updates or corrects the credit reporting information. (*Id.* at No. 55.)

Regarding Bennett's disputes, NFCU investigated by reviewing information Bennett provided to the CRAs that was passed on to NFCU and information in NFCU's system regarding the accounts. (*Paulson Decl.* ¶¶ 53, 57.) NFCU also evaluated whether it needed to analyze additional information to fully assess the dispute, and made a determination regarding the accuracy of its reporting. (*Id.* at ¶ 57.) NFCU confirmed that both the personal loan and the auto loan had been charged off as a loss on November 25, 2020, and, therefore, the reporting was accurate and complete. (*Id.* at ¶ 58.)

//

### C. Bennett files this lawsuit.

On February 14, 2024, Bennett filed this lawsuit against Defendants NFCU, Equifax Information Services LLC and Trans Union LLC.[2] The First Amended Complaint alleges two causes of action for (1) violation of the Federal Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b) and (2) violation of the California Consumer Credit Reporting Agencies Act ("CCCRAA"), Cal. Civil Code § 1785.1. NFCU now moves for summary judgment on both causes of action.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. "Disputes over

---

[2] On September 30, 2024, a joint motion to dismiss Defendant Equifax Information Services LLC was granted [Doc. 35]. On October 22, 2024, a joint motion to dismiss Trans Union LLC was granted [Doc. 39].

5

irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

### III. ANALYSIS

NFCU raises two grounds for summary judgment. First it argues that its reporting on Bennett's loans was not inaccurate or misleading. (*P&A* [Doc. 44-1] at 10:2–3.) Second, it argues its investigation was reasonable. (*Id.* at 10:3–6.) Because the Court

6

finds as a matter of law that NFCU's reporting was neither inaccurate nor misleading, summary judgment is required as to both causes of action.

### A.     <u>Violation of the FCRA</u>

To prevail on a cause of action for violation of section 1681s-2(b) of the FCRA, a plaintiff must prove: "(1) Defendant is a 'furnisher'; (2) Plaintiff notified the CRA that Plaintiff disputed the reporting as inaccurate; (3) the CRA notified the furnisher of the alleged inaccurate information of the dispute; (4) the reporting was in fact inaccurate; and (5) Defendant failed to conduct the investigation required by § 1681s-2(b)(1)." *Miller v. Westlake Servs. LLC*, 637 F. Supp. 3d 836, 848 (C.D. Cal. 2022) (citing *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009)). However, before a court considers the reasonableness of an investigation, "the consumer must make a 'prima facie showing' of inaccuracy in the agency's reporting." *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022) (extending requirement to furnishers of information). The reason is that "if there is no inaccuracy, then the reasonableness of the investigation is not in play." *Id.*

Bennett argues his credit report is inaccurate because NFCU reported his personal and auto loans were charged-off. (*Opp'n* [Doc. 46] at 6:20–21.) Bennett contends the repayment arrangements for his loans "superseded the original loan agreements. . . ." (*Id.* at 7:26–27.) Because the "superseding contracts governed Bennett's new monthly obligations to NFCU" and, according to Bennett, because he was current on those obligations, NFCU's reporting that the loans were charged off is inaccurate. (*Id.* 8:9–17.)

In its reply, NFCU disputes that the repayment arrangements superseded the terms of the original loans. (*Reply* [Doc. 49] 4:7–12.) Additionally, NFCU points out that the letters confirming the repayment arrangements informed Bennett that the "outstanding default will continue to be reported to the credit bureaus until the agreement is complete and satisfied. . . ." (*Id.* 5:1–11.)

Based on the parties' arguments, the central issues is whether the repayment arrangements modified or superseded the original loan agreements so that if Bennet was current on those payments, NFCU's reporting was inaccurate. While neither party has cited an analogous Ninth Circuit case, an analogous Eleventh Circuit case provides guidance.

In *Felts v. Wells Fargo N.A.*, 893 F.3d 1305 (11th Cir. 2018), plaintiff Christina Felts refinanced her home with a loan serviced by defendant Wells Fargo Bank. As the servicer of the loan, Wells Fargo was responsible for collecting Felts' mortgage payments of $2,197.38 and reporting certain information to CRAs. After Felts lost her job, she contacted Well Fargo to discuss a revised payment plan for the loan. Eventually, Felts enrolled in an unemployment forbearance plan (the "Plan") that required her to make monthly payments of $25 during the Plan period. *Id.* at 1310. In a letter Wells Fargo sent to Felts about the Plan's terms, Felts was informed that the regular mortgage payments would continue to accrue and be due at the end of the Plan period, but Felts could then apply for repayment assistance for the accrued amount. *Id.* Before Felts entered the Plan, this condition was also mentioned in a telephone call with a Wells Fargo employee who told Felts: "after the Plan ended, Wells Fargo would 'take all that past due and they'll just tack it on to the end of the loan.'" *Id.* In response, Felts asked if her payments would still be considered late, to which the representative responded "'[y]es. Because it's not the contractual payment.'" *Id.*

After successfully completing the Plan, Felts sold her home and paid off the remaining balance on the loan. She then applied for another loan to buy a new house but was denied because Wells Fargo had reported her loan as "delinquent" and "past due" with an outstanding balance of $22,308. *Id.* at 1310. Felts submitted disputes to the CRAs, which reported them to Wells Fargo. After investigating the disputes, Wells Fargo reported the account status "as 'paid in full' and changed the 'amount past due' [to] $0.00." *Id.* at 1311. However, Wells Fargo did not correct the delinquency and reported that Felts' account was past due during the Plan period because during that time "the

8

account was considered past due for each of those months because Felts did not make her full contractual payment." *Id.*

Felts filed a lawsuit against Wells Fargo for violation section 1681s-2(b) and Wells Fargo moved for summary judgment. The District Court granted the motion concluding that "there was no genuine factual dispute as to the accuracy of the information Wells Fargo reported to the CRAs because there was no evidence of any factual inaccuracy or materially misleading statement." *Id.*

On appeal, Felts argued the District Court erred in finding that she failed to show Wells Fargo reported inaccurate information because she made all the required $25 monthly payments. *Id.* at 1313. According to Felts, "under the explicit terms of the Plan, she was not required to pay the full amount due on the Note during the Plan period" and cited as support Wells Fargo's confirming letter, which stated that "[t]he total accrued amount then *becomes due* and is your responsibility to pay after you complete the Plan, or when you become fully employed." *Id.* at 1314 (emphasis in original). Because the amount accrued was not due until after the Plan period, Felts argued she was not delinquent on her debt and pointed to the definition of "delinquent," which means "not paying a debt as agreed." *Id.*

The Eleventh Circuit rejected Felts' argument for a number of reasons. Relevant to this case, the court explained that Felts misconstrued Wells Fargo's reporting obligations. According to the Court,

> Wells Fargo was not required to furnish information to the CRAs regarding every agreement it formed with Felts. Instead, Wells Fargo was required to furnish information to the CRAs regarding Felts' payment status and history for one agreement in particular: the Note Felts signed for the Loan. The CRAs requested, and Wells Fargo submitted, information regarding Felts' compliance with her obligation to make installment payments in accordance with the Note she signed. Felts' apparent compliance with the terms of a second, separate agreement she entered into with Wells Fargo—the Plan— has no bearing on the accuracy of the information Wells Fargo reported to the CRAs regarding Felts' compliance with the terms of her first, original

>agreement—the Note—unless the Plan legally modified the terms of the Note.

*Id.* at 1314. Regarding whether the Plan modified the terms of the Note, the court found Felts failed to identify any evidence supporting a modification. *Id.* In addition, the court found Wells Fargo's correspondence with Felts established the Plan did not modify the Note. The Plan letter "explicitly stated that Felts' payments under the Plan did not satisfy the amounts 'owed' under the Note," which was inconsistent with a modification of the Note and confirmed the opposite. *Id.* at 1315. Further, the court relied on the Wells Fargo employee's telephone conversation with Felts, during which Felts was told that "her payments would 'still show[] up as a late payment' because 'it's not the contractual payment.'" *Id.*

Although *Felts* is an Eleventh Circuit case, in the absence of controlling Ninth Circuit authority, this Court is persuaded by the court's reasoning. Here, there is no dispute that when Bennett entered the repayment plans, he was delinquent on both his personal loan and automobile loan. There is also no dispute that the amounts due under the repayment plans were less than the amounts due under the loans and thus insufficient to bring the loans current. Accordingly, NFCU's reporting that the loans were charged off was not inaccurate.

Like the plaintiff in *Felts*, Bennett's argument that NFCU's reporting was inaccurate because he was current on the repayment arrangements misconstrues NFCU's reporting obligation. It was not "to furnish information to the CRAs regarding every agreement it formed with [Bennett]" but instead to report Bennett's compliance with the terms of the original personal and auto loans. *Felts*, 893 F.3d at 1314. Thus, Bennett's alleged compliance with the terms of the separate repayment plans "has no bearing on the accuracy of the information" NFCU reported about his compliance with the terms of the original loans "unless the [repayment plans] legally modified the terms of the [original loans]." *Id.*, 893 F.3d at 1314. Again, like *Felts*, Bennett has provided no evidence remotely suggesting that the repayment plans modified the terms of the original loans. To

the contrary, NFCU's correspondence to Bennett advising him that the "outstanding default will continue to be reported to the credit bureaus until the agreement is complete and satisfied" (*Paulson Decl.* at Ex. B) support the finding that no modification was intended and that NFCU's reporting was accurate. Moreover, after this lawsuit was filed, Bennett acknowledged that neither loan was paid in full. (*See Hicks Decl.* [Doc. 44-3] ¶ 5, Ex. 3 at Nos. 5, 6.) Thus, even if the terms of the repayment plans somehow modified the original loans—which they do not—NFCU's continued reporting of the outstanding defaults would be accurate since neither repayment plan is "complete and satisfied."

Finally, Bennett also contends that even if NFCU's reporting was technically correct, it was still misleading. (*Opp'n* at 10:4–12:17.) This argument is unpersuasive, particularly given that there is no dispute that well after this lawsuit was filed, Bennett remained delinquent on both the personal and auto loans. As *Felts* cautioned, "if the Court adopted [Bennett's] rule of law—that [NFCU] was required to report [his] payments as timely because it instructed [him] to make lower payments [under the repayment arrangements]—[Bennett's] credit report may have been misleading to prospective lenders, the report's intended recipients." *Id.*, 893 F.3d at 1319.

For these reasons, NFCU is entitled to summary adjudication of the FCRA cause of action.

**B.    Violation of the CCCRAA**

To prevail on a cause of action for a violation of the CCCRAA, a plaintiff must prove that "(1) Defendant is a 'person' under the [CCCRAA], (2) Defendant reported information to a CRA, (3) the information reported was inaccurate, (4) Plaintiff was harmed, and (5) Defendant knew or should have known that the information was inaccurate." *Miller*, 637 F. Supp. 3d at 855 (citing *Robins v. CitiMortgage, Inc.*, 2017 WL 6513662, at * 14 (N.D.Cal. Dec. 20, 2017)).

For the reasons stated above, the Court finds NFCU did not report inaccurate or misleading information regarding Bennett's personal or auto loan. Accordingly, summary adjudication of the CCCRAA cause of action is also warranted.

### IV.  CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** NFCU's summary-judgment motion [Doc. 44].

**IT IS SO ORDERED**

Dated:  November 20, 2025

_____
Hon. Thomas J. Whelan
United States District Judge